IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Zita L. Weinshienk

Civil Action No. 04-cv-00122-ZLW-BNB

LYNN JEWELL,

      Plaintiff,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,

      Defendant.

---

## ORDER

---

The matter before the Court is LINA's Motion For Judgment On the Administrative Record. On June 2, 2006, the Court entered Judgment in Plaintiff's favor in this action for long-term disability benefits under 29 U.S.C. § 1132(a)(1)(B). Defendant appealed to the United States Court of Appeals for the Tenth Circuit (Tenth Circuit), which reversed the Judgment and remanded the action for further proceedings consistent with its written Opinion. This Court thereafter issued an Order Reinstating Case and a Minute Order requiring further briefing on LINA's Motion For Judgment On The Administrative Record. The Court has considered carefully the further briefing on the present motion, the entire case file including the administrative record, and the applicable legal authority. The Court has determined that the present motion can be decided on the parties' papers without a hearing.

## I. Exhibits Not Considered

On December 13, 2005, the Court allowed Plaintiff to supplement the administrative record with a February 7, 2005, letter report authored by Bruce H. Peters, M.D.; a February 9, 2005, letter report authored by David U. Caster, M.D.; and an affidavit executed by Plaintiff on February 11, 2005. On appeal, the Tenth Circuit concluded that the Court erroneously admitted and considered these three exhibits in entering Judgment for Plaintiff. Pursuant to the Tenth Circuit's opinion, the Court has not considered these three exhibits in reaching the conclusions set forth herein.

## II. Background

### A. Plaintiff's Claim for Benefits

This action was removed from state court, El Paso County, Colorado, to this Court on January 23, 2004. The two claims pleaded in the Complaint were state law claims for breach of contract and bad faith breach of contract. However, as Plaintiff has admitted, both of those claims are preempted by the Employee Retirement Income Security Act (ERISA).[1] Under the doctrine of complete preemption, the state claims are automatically converted to a federal claim under ERISA.[2] The parties agree that Plaintiff's only claim is one for plan benefits under 29 U.S.C. § 1132(a)(1)(B) of ERISA.

Plaintiff seeks to recover long-term disability (LTD) benefits under the group disability plan (Plan) of his former employer, Sprint Telecommunications. Defendant

---

[1] 29 U.S.C. §§ 1001 *et seq.*

[2] 29 U.S.C. § 1444(a); 29 U.S.C. § 1132(a)(1)(B); Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 66 (1987); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46 (1987).

Life Insurance Company of North America (Defendant or LINA) issued the certificate of insurance that insured the Plan, and also is the claim administrator of the Plan.  In April 1998, Plaintiff, who was employed as Sprint's Director of National Sales, submitted a claim for short-term disability (STD) benefits under the Plan.  Plaintiff stated that he was "[u]nable to perform job due to severe head pain, dizziness, misspelling, panic attacks where unable to do anything, unable to lead people.  Depressed.  On medications.  Physician has off work during testing.  Is being referred to other physicians for tests." (Rec. 455).  Plaintiff's claim for STD benefits was approved on June 1, 1998.  (Rec. 437).  On September 14, 1998, the STD case manager notified a long-term disability (LTD) case manager that Plaintiff's STD benefits would end as of October 20, 1998, but that he might be eligible for LTD benefits.  (Rec. 413).

An employee is "disabled" under LINA's LTD policy if

> he is unable to perform all the material duties of his regular occupation; and after Monthly Benefits have been payable for 24 months, he is unable to perform all the material duties of any occupation for which he is or may reasonably become qualified based on his education, training, or experience.

(Rec. 005).  However, the LTD policy's "Mental Illness, Alcoholism and Drug Abuse Limitation" states that LTD benefits will be paid for only 24 months if the disability is "caused or contributed to by" psychiatric conditions including depressive disorders, anxiety disorders, mental illness, bipolar affective disorder, and psychotic disorders. (Rec. 018).   Both parties acknowledge that whether Plaintiff falls under this limitation hinges on whether Plaintiff's condition is "organic" in nature.  The parties appear to

agree that an "organic" brain disorder is one resulting from physical changes in the brain structure, such as lesions or changes resulting from a traumatic physical injury to the brain, while a "non-organic" or "psychiatric" brain dysfunction is a mental illness which is not caused by any physical changes to the brain.  If Plaintiff has an "organic" brain condition, he does not fall under the mental illness limitation of the LTD policy.

Plaintiff applied for LTD benefits after his STD benefits ended.  LINA conducted an investigation of Plaintiff's eligibility for LTD benefits, including contacting Plaintiff's treating physicians and obtaining records from them.[3]  On November 9, 1998, LINA approved Plaintiff's claim for LTD benefits, effective October 19, 1998.  On June 17, 1999, Joel B. Maiman, Ph.D., submitted a Supplementary Claim/Disability Benefits form indicating that Plaintiff suffered from "depression, anxiety, fatigue, low self confidence . . . ."  (Rec. 293-294).  On July 12, 1999, LINA informed Plaintiff that he fell under the mental illness limitation of the LTD policy, and therefore would receive benefits for 24 months only, until October 18, 2000.  (Rec. 288).

On May 3, 2000, LINA wrote to Plaintiff reminding him that his LTD benefits would be expiring on October 18, 2000, based on the mental illness limitation, and told Plaintiff that if he had "physical conditions that you feel are contributing to your disability, please provide us with the names, addresses and telephone numbers of the physicians treating you for those conditions . . . by 5/17/00."  (Rec. 272).  A case manager contacted Plaintiff by phone on May 8, 2000, and confirmed that Plaintiff understood

_____

[3]Defendant indicates that the records it received are located at Rec. 331-393.

4

that the LTD benefits would terminate on October 18, 2000.  The case worker's notes indicate that Plaintiff stated that he had "no other medical to submit."  (Rec. 269).

On August 15, 2002, Plaintiff submitted a request for reconsideration to Sprint, stating that his benefits ended "due to a mis-diagnosis" and that he "should have been diagnosed with physical, organic and traumatic brain injuries, and I had a stroke."  (Rec. 262-263).  Sprint contacted LINA about Plaintiff's request, and on January 3, 2003, Brenda Bartlett of LINA spoke with Plaintiff.  (Rec. 223).  Bartlett's notes state that Plaintiff acknowledged that "there is little documentation," but said "we can't prove it's not organic."  According to Bartlett's notes, Plaintiff said that his doctors "decided 2 ½ years after claim closed."  (Rec. 223).

On January 31, 2003, Bartlett wrote to Plaintiff, stating that LINA had conducted a review of his appeal and was reaffirming its previous denial of additional benefits.  (Rec. 220).[4]  Bartlett stated, "while we respect the opinion of your physicians, there is no medical documentation of any of the head injuries, nor any positive testing to show a brain injury or trauma has occurred.  The documentation in your file does not support the presence of an organic disorder."  Bartlett said that Plaintiff could submit additional medical information in connection with a voluntary appeal.  (Rec. 221).  On September 15, 2003, Plaintiff's attorney submitted a new appeal along with additional medical records.  (Rec. 202-218).

---

[4]The letter is on CIGNA Group Insurance letterhead; CIGNA apparently was involved in the coverage issue.

A memo to LINA's file concerning Plaintiff's claim dated November 7, 2003, states that all of the medical information that Plaintiff had recently submitted, with the exception of one report, duplicated information that LINA had already considered, and that there was no medical information indicating that, as of the date that Plaintiff's claim was closed (October 18, 2000), Plaintiff had an organic brain problem. On November 7, 2003, LINA denied Plaintiff's appeal, informing him that there were "no medical records to support that you have any physical problems at the time your claim was closed that would have prevented you from working." (Rec. 191-192). Plaintiff's attorney then submitted additional medical records on November 12, 2003, (Rec. 44-45) to which LINA apparently did not respond.

**B.    Medical Records**

The Court has reviewed all of the submitted medical records, and discusses herein those which are most pertinent to the issues in this case.

### 1.    Psychiatrist David Caster, M.D.

Psychiatrist David Caster, M.D. treated Plaintiff for over five years beginning in 1997,[5] seeing him mostly for medication review relating to depression. On November 10, 1998, Dr. Caster stated that Plaintiff's "[n]europsychological evaluation shows that this is a depression that does not appear to be related to neuropsychological components at all and in fact his neuropsychological testing looks good." (Rec. 137). On July 3, 2002, Dr. Caster noted "evidence of a head injury" resulting from a

---

[5]The parties appear to agree that the documents at Rec. 136-143 are records from Dr. Caster. The date on the first entry contained in Rec. 136 is not legible, although apparently there is no dispute that it is a 1997 entry.

motorcycle accident that Plaintiff recently had suffered.  (Rec. 141).  Six months later,

Dr. Caster changed his opinion concerning the nature of Plaintiff's condition.  In a

treatment note dated November 26, 2002, Dr. Caster stated,  "I have had a long

conference with Joel Maiman [Plaintiff's psychologist] about [Plaintiff].  It is clear that we

feel that the diagnose [sic] Personality Disorder secondary to closed head injury is

applicable.  I have told [Plaintiff] that from my perspective he needs to have a new

neurological assessment and he needs to ask for the raw data that was collected during

his neuropsychological assessment so this could be re-reviewed."  (Rec. 142).

On December 3, 2002, Dr. Caster wrote a detailed letter to primary care

physician Lisa Dunham, M.D. summarizing his treatment of Plaintiff.  That letter states:

> Lynn Jewell is a fifty year old male who has been followed by
> the undersigned since December 9, 1997 . . . .
>
> This man indicated at that time, that he thought he had
> approximately a ten year history of depression, including a
> hospitalization (self committed) for depression and at one
> point, had been diagnosed as having a bipolar disorder and
> was treated with a combination of 1000 mg of Depakote
> (with a therapeutic level) an 300 mg of Wellbutrin.  It was
> noted that this man had a variety of symptoms which
> appeared to be chronic and poorly controlled associated with
> dysphoric mood, poor memory function, difficulty at times
> with searching out words and had difficulties in modulating
> his anger.  The patient was relatively healthy with the
> exception that he did have a number of head injuries
> beginning back in 1968 when on at least seven occasions,
> he had been unconscious for a period of time.
>
> He was followed by the undersigned in 1998, when I was
> contacted by his therapist, George Kinsley, LPC as well as
> his wife, about what they considered to be a general
> deterioration in his mental functioning.  He was having
> significant difficulties with organizational skills and memory

function.  At times, he had some difficulty even with ambulation.  He was at that point, referred for a neuropsychological assessment as well as for a neurological evaluation and he was seen by Leetetia [sic] L. Thompson, Ph.D. at the University of Colorado Health Science Center for neuropsychological assessment (this referral came from William Wilcox, M.D., his primary care physician).  He did undergo a test battery the summary of which was referred, although the actual test data was never sent for specific review.  It does appear that this is an intelligent man who did not show significant impairment on his neuropsychological assessment.  Attempts were made to get a referral from Cigna to get him into a neurologist, which was ultimately accomplished in December, 1999 when he was seen initially by Bruce Peters, M.D..  Bruce Peters, MD concern related to the fact that while he certainly did seem to have a mood disorder there were significant concerns about what appeared to be evidences of organicity associated with brain function and difficulty with organization.  Dr. Peters did review his history relating to head injury and it was apparent on a MRI that he did evidence of cystic lesion.  The significance of this however, could not be determined.  Dr. Peters felt at that time that it was possible that he was having complex partial seizures.  He was reassessed by Dr. Peters in November, 2002.  He reviewed his history which suggested significant memory difficulties which appeared to be worsening.  There were some evidences of slower speech and difficulty with not understanding things that he had historically done.  He acknowledges some symptoms which sounded dissociative or seizure like in origin.  During that assessment he indicated that he was ordering another electroencephalogram, the results of which I am unaware.

During this period of time, beginning in 1998 Mr. Jewell was tried on numberous [sic] different medications, mood stabilizers such as Eskalith and antipsychotic such as Zyprexa.  He was started in 2000 on doses of Dexedrine, this was a somewhat desperate decision based on the chronic lack of response to more typical medications and Dexedrine and other stimulants have been used in an attempt to treat refractory depressions.  It does appear that taking this medication, he has demonstrated a greater degree of improvement both from the standpoint of energy

(stimulant effect?) And also some improvement at least, for
periods of time, in his overall ability to focus and pay
attention. This particular result in improvement in function
may demonstrate that as a result of head injuries he is
suffering from attention deficit disorder like symptoms and
the utilization of stimulants are producing an atypical
response under these circumstances.

Over the last four years of treatment it has become
increasingly clear that this man has cognitive dysfunction,
difficulty with perceptual processing, memory function,
headaches, mood discontrol, and at times coordination and
disassociation, all of which are symptoms that are more
suggestive of an organic basis then [sic] are symptoms of a
classic or even atypical bipolar disorder or psychologically
driven dysthymic disorder.

While he may well have had a coincidental mood disorder he
however has a personality change secondary to general
medical condition secondary to closed head injury.

(Rec. 226-227).

Dr. Caster completed a Social Security Psychiatric Review technique form for

Plaintiff in April 2003. Dr. Caster indicated on the form that Plaintiff suffers from

"Organic Mental Disorders," defined as "[p]sychological or behavioral abnormalities

associated with a dysfunction of the brain;" "Affective Disorders," defined as

"[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome;"

and "Personality Disorders." (Rec. 122-135). He identified the symptoms of Plaintiff's

organic mental disorders as: memory impairment, perceptual or thinking disturbances,

change in personality, disturbance in mood, emotional liability and impairment in

impulse control, and loss of measured intellectual ability. (Rec. 123). He identified the

symptoms of Plaintiff's affective disorders as: (1) depressive syndrome, characterized

by behaviors including anhedonia, appetite and sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking, and (2) manic syndrome, characterized by behaviors including pressures of speech, flight of ideas, decreased need for sleep, easy distractability, and involvement in activity that has a high probability of painful consequences which are not recognized.  (Rec. 124).  Dr. Caster stated,

> [t]his person, since the time of the head injury[6] has complained of difficulty with memory and attention and focus, which at times have been treated with Dexedrine with some degree of success.  He tends to have difficulty processing complex instructions, demonstrates difficulty with his thinking.  He is judged, particularly by family members as having a change in [pe]rsonality and not being the positive, outgoing person that he has been historically.  He has difficulty with mood instabili[ ]ty and depression and has demonstrated impulsive behaviors such as riding motorcycles without helmets.

(Rec. 123).  Dr. Caster concluded that "[t]his person suffers from a dual diagnosis with a bipolar disorder that has been rel[___][7] successfully treated but this treatment has been impaired dramatically by the presence of head injury."  (Rec. 129).

## 2.    Primary Care Physician William Wilcox, M.D.

Plaintiff first saw primary care physician William Wilcox, M.D. on April 15, 1998.  Dr. Wilcox's notes from the initial visit state in part:

> [Plaintiff's] main problem is depression with anxiety.  He complains of memory loss, trembling, panic, anxiety, he cannot think clearly, trouble making decisions, misspelling

---

[6]Dr. Caster did not specify which head injury he was referring to.

[7]The letters in this word after "rel" have been cut off on the copy of the Record filed with the Court.

words, crying a lot over anything, avoiding decisions and situations. He cannot put his thoughts together. His thoughts are unorganized or he goes blank. He is terrified he is going to lose his job. He hates his job which is something he has thoroughly enjoyed previously and he feels like he cannot win. He seems to get mad at little things. He always feels behind. He has perfectionist tendencies which he used to be laid back and calm. His handwriting has deteriorated. He is not sleeping well. He cannot do the leadership job that was easy for him for the last 20 years. He has no motivation. He is paranoid about work. He is defensive and he snaps at people. He notices recently that he cannot judge distances as well. For instance he will run up on stopped cars and have to slam on the brakes. He also has unexplained weight loss. He has lost 50 pounds in the last one and a-half years without trying. In fact he is eating like "a pig" to keep his weight up but he continues to lose it. He is currently under the care of a psychiatrist, Dr. David Caster, but that has not helped at all and so he wants to be evaluated for medical cause of these problems. This all seemed to start with an emotional breakdown in August of 1995. He took some medication, had a little bit of time off and then he was doing fine for quite some time and has just recently deteriorated rapidly again. Of note, he did have a head injury where he was knocked out in 1995 digging a post hole. . . . He has been treated aggressively as above but has had no improvement, in fact marked deterioration with those medications. Will check a Depakote level to rule out Depakote toxicity. Will check a biochem profile, a B-12 and a folate level and a cerebroplasm to rule out Wilson's disease. Will refer for neuropsychiatric testing. Will continue his current medicines for now and follow-up next week.

(Rec. 443-444). On April 22, 1998, Dr. Wilcox noted that Plaintiff stated that "his symptoms have been persisting or if anything getting worse and he would like to know where to go next." His "[l]aboratories [are] within normal limits. . . . A negative biochemical workup to date. . . . Will attempt to gather all the data available and then try to arrange neuropsychiatric testing." (Rec. 445). A Family and Medical Leave Act

form completed by Dr. Wilcox on April 29, 1998, states "[w]orsening syndrome of unexplained weight loss, memory loss and depression, not responding to medical therapy, in the midst of a workup." (Rec. 368).

Plaintiff had a CT scan on April 28, 1998. The radiology report notes that the observed areas were normal, other than "a rounded 1 cm low attenuation area in the basal ganglia that could be an old stroke." (Rec. 350). On May 12, 1998, Plaintiff saw Dr. Wilcox to discuss the results of the CT scan. Dr. Wilcox's notes report a "[b]asically normal CT scan. The patient denies any history of any event that might be like a stroke and he denies any neurologic deficits in particular so will wait on that for now. The patient is to get his neuropsychiatric testing July 1, so will follow up after that." (Rec. 52).

On September 21, 1998, Dr. Wilcox reported that Plaintiff has been on multiple medications "with no real benefit," and "has taken himself off of all of his medication." (Rec. 55). While Dr. Wilcox noted that the CT scan, neuropsychiatric testing, and biochemical workup all were negative, he stated that "an MRI may be appropriate since there was a moderate abnormality noted on the CT scan and since postconcussive syndrome certainly is a possibility." (Rec. 55). Dr. Wilcox's notes from September 8, 2000, state that Plaintiff reported "doing okay" on his current medications, Eskalith, Dexedrine, Prozac, and Ambien. (Rec. 57). Then, on October 13, 2000, Plaintiff told Dr. Wilcox that "he is doing as well with his depression and anxiety etc. as he has in years. He is being followed by Dr. David Caster with his psychiatric medications. He

has no other complaints." (Rec. 58).  Dr. Wilcox indicated that Plaintiff's condition is

"[d]epression with anxiety, perhaps bipolar disorder." (Rec. 58).

### 3.    Laetitia L. Thompson, Ph.D.

As mentioned above, in 1998 Dr. Wilcox referred Plaintiff to Laetitia L.

Thompson, Ph.D., an associate professor of psychiatry and neurology, for

neuropsychological testing.  The purpose of the testing was "to provide additional

information about [Plaintiff's] mental functioning and whether he actually shows any

cognitive deficits." (Rec. 353).  The testing was performed on July 1, 1998.  Dr.

Thompson reported that "[o]nly two of his formal neuropsychological test results

deviated from normal expectations and, in the absence of supporting evidence from

other tests in the battery, his results do not suggest the presence of a clinically

significant cerebral disorder. . . .  All the rest of Mr. Jewell's test results were within

normal limits." (Rec. 355).  She further opined that Plaintiff "may have a little difficulty

with attention and concentration at times, but I think this is likely to be secondary to his

depression.  His depression may also be influencing his perceptions of his cognitive

functioning and it may be lowering his motivation and initiative.  I do not think that he

has memory or other cognitive dysfunction separate from his depression." (Rec. 356).

Dr. Thompson's Final Summary states that Plaintiff "does not show evidence of

significant neurocognitive difficulties or any early neurodegenerative or dementing

process.  He does appear to have a significant psychiatric disorder that is likely causing

his perceptions of difficulty in thinking, but I did not find convincing evidence of true

neurocognitive deficits." (Rec. 357).

### 4.    Psychiatrist Kenneth Gamblin, M.D.

Psychiatrist Kenneth Gamblin, M.D. saw Plaintiff on August 26, 1998, to perform an Independent Medical Examination (IME) at LINA's request.  (Rec. 417-421).[8]  Dr. Gamblin noted that during the exam Plaintiff became tearful easily and acknowledged feeling hopeless and helpless.  However,

> there was no evidence of hallucinations, delusions, tangential thoughts and blocking of thoughts, or loose associations.  His abstracting ability on proverb interpretation was good.  He was oriented to time, place and person, and had grossly intact memory.  There was no evidence of word finding problems.  He was able to count backward from 100 rapidly and correctly by 3's and 7'[s] without losing his place. He could remember a digit span of six digits in reverse.

(Rec. 419).  Dr. Gamblin's primary diagnosis was Major Depression, recurrent.  (Rec. 420).  He did not specifically mention the possibility of an organic brain dysfunction.

### 5.    Neurologist Bruce H. Peters, M.D.

Neurologist Bruce H. Peters, M.D. apparently first saw Plaintiff in December 1999.  (Rec. 240-242).  Plaintiff described symptoms to Dr. Peters including headaches, difficulty remembering, difficulty speaking clearly, slowed speech and reading, poor concentration, dizziness, and depression which is helped by Lithium.  Dr. Peters' report indicates that in 1994 Plaintiff was hit over the right eye while using a post hole digger and briefly lost consciousness, and that he has had numerous falls from his motorcycle,

---

[8]Although Dr. Gamblin's report states that the examination was performed at the request of "Intracorp," Defendant asserts, and Plaintiff does not appear to dispute, that LINA requested the examination.

but always wears a helmet and has never lost consciousness after those falls.  Dr.

Peters stated,

> [Plaintiff] has had an MRI scan which shows the presence of
> a cystic lesion in the right temporal region and while that is
> played down on the MRI report[,] [i]t is certainly of concern
> given his history.  The CT scan of the head had shown a
> 1cm attenuation area in the right basal ganglia area.

(Rec. 241).  Dr. Peters continued,

> I am quite concerned that this man has complex partial
> seizures.  The cystic lesion in the right temporal region, I
> believe, is of concern.
>
> I am ordering a sleep deprived electroencephalogram and
> will make a decision following that. . . .
> . . .
>
> This is going to be a tough circumstance to handle. . . .  We
> will just do the best we can, but I do believe after this
> evaluation that this man has more than a purely emotional
> disorder and that organic factors are playing a role here.

(Rec. 242).

The electroencephalogram [EEG] ordered by Dr. Peters was performed on

January 11, 2000.  The EEG report states that the EEG "appears to be within normal

limits.  There is no clear evidence of epileptiform activity during the period of this

tracing."  (Rec. 239).

Plaintiff apparently did not see Dr. Peters again until November 11, 2002, almost

three years later.  In his notes concerning this visit, Dr. Peters stated that the EEG

performed in 2000 "did not show evidence of a seizure disorder," but added

parenthetically that "it is not demanded that a diagnosis of seizure disorder be

documented by an electroencephalogram but it is a helpful certifying finding." (Rec.

182). Dr. Peters went on to state that

> I have again ordered an electroencephalogram to see if there are abnormalities. If abnormalities were found, they would be quite important. The situation is a difficult one because it does depend upon a history of events even three years ago and there have been some changes in circumstances in the last three years that might potentially result in new symptoms, but in the absence of other irrefutably documented historical circumstances or abnormalities on the examination, I believe that the electroencephalogram is again of great assistance with differentiation of a primarily functional from a primarily organic circumstance.

(Rec. 183). Plaintiff underwent a second EEG on December 27, 2002. (Rec. 117-118).

The results of the EEG were "normal," although EEG report states that "[a] normal EEG

does not rule out epilepsy." (Rec. 117-118). Plaintiff returned to see Dr. Peters on

January 23, 2003. (Rec. 215). Dr. Peters noted that the second EEG had been read as

normal, but stated that Plaintiff "has had three episodes of unusual inappropriate

behavior for which he has no remembrance and a clinical diagnosis of a complex partial

seizure disorder is appropriate." (Rec. 215). He continued,

> [h]is affect is unusual and he has been diagnosed as having attributes of bipolar disorder and is being appropriately medicated by Dr. Richard Caster. I would also recommend that he continue on the Topomax. I strongly feel he should be considered to have an element of an organic as opposed to a completely functional disorder. The disorder has caused unusual aspects of behavior, but organic factors are present here and are, themselves, disabling.

(Rec. 215).

### 6.    Primary Care Physician Lisa Dunham, M.D.

Dr. Lisa Dunham became Plaintiff's primary care physician after the retirement of

Dr. Wilcox.  On November 6, 2002, Plaintiff saw Dr. Dunham for "several concerns."

(Rec. 69).  Included among those concerns were,

> difficulty with mental status changes, mood swings, inability
> to concentrate and headaches.  He has also had trouble with
> memory loss and says he has felt dyslexic at times and his
> speech has been somewhat slower than usual.  His
> concentration has been very poor and had to leave his job
> as Vice President of Sprint.  He was referred to a neuro
> psychiatrist.  For a time was treated with mood stabilizers
> and other anti-depressants without improvement. . . .  He is
> very concerned because he was placed on disability from his
> work under psychologic disorder and mood disorder but his
> coverage ended after 2 years and he would like to be
> reinstated under medical disability since it is felt that his
> problems are due to an organic nature.  Patient reports
> recently having seizure type activity where he woke up in the
> middle of the night on the floor with several objects thrown to
> the floor and he has no memory of it.

(Rec. 69).  Also on November 6, 2002, Dr. Dunham wrote a letter to LINA which stated

in part,

> I have evaluated Mr. Jewell and reviewed his history
> including reports from his neurologist.  He has had trouble
> with mental status changes, memory loss, poor
> concentration and dizziness.  He has also experienced
> dyslexia and dysgraphia in addition to his mood swings,
> which have not responded to anti-depressants or mood
> stabilizers.  He has been evaluated by a neurologist recently.
> I agree that certainly, all of these symptoms are consistent
> with organic brain disorder.  I also suspect that he has a
> seizure disorder and will be following with his neurologist.  I
> ask that you reconsider his disability status based on this
> information.

(Rec. 235).  November 14, 2002, treatment notes by Dr. Dunham go on to state,

> [t]here has been some question by his insurance about
> mental illness.  However, based on his history of multiple
> closed head injuries and symptoms such as memory loss,
> confusion, headaches and episodes suspicious for seizure
> disorder, I think we are looking at more of an organic brain
> disorder.  Furthermore, he has been evaluated and treated
> by a psychiatrist and a psychologist and has not responded
> to antipsychotics or mood stabilizers. . . .  He will be seen by
> Dr. Fodor for further evaluation of this and we will await her
> records.

(Rec. 71).

### 7.    Psychologist Joel Maiman, Ph.D.

Plaintiff began seeing licensed clinical psychologist Joel Maiman, Ph.D. in

November 1998.  (Rec. 208).  In a letter to Dr. Dunham dated December 10, 2002, Dr.

Maiman stated,

> I have been providing professional psychological services for
> Lynn Jewell intermittently since 18 November 1998.  He
> initiated a second episode of treatment on 3 December 2001
> and presently is in weekly psychotherapy coordinated with
> his psychiatrist, David Caster, M.D.  Mr. Jewell's therapy has
> been protracted and complicated notwithstanding his efforts
> and motivation for greater levels of health and stability.
>
> The multi-modal treatment plan has included psychotherapy,
> frequently with the participation of his wife, Kathy, psychiatric
> consultations with Dr. Caster, and a variety of different
> psychotropic medications.  His diagnosis has been DSM-IV
> 266.30 major Depression - Recurrent, which was congruent
> with his history and presenting symptoms.  Unfortunately,
> Mr. Jewell did not respond to the plan as expected, even as
> different medications and modifications to the therapy were
> implemented.  While there were specific areas of progress,
> the overall clinical picture was not improving, rather it was
> deteriorating leaving Mr. Jewell unable to function normally
> which in turn precluded him [from] being able to secure
> employment, even at levels well below his former job with
> Sprint.

> Based upon coordination with the medical component of the treatment plan, the lack of response to various interventions, and additional information about Mr. Jewell's history, the diagnosis has been changed to DSM-IV 310.1, Personality Change Due To Closed Head Injury. Mr. Jewell is presently in the process of a neurological assessment which may reveal more specifically where the closed head injury or injuries is/are located. Mr. Jewell is continuing with his therapy with a focus on his family loss issues which are secondary to his organic problems.

(Rec. 208).

### 8.    Primary Care Physician James L. Derickson, M.D.

Plaintiff saw primary care physician James L. Derickson, M.D. on June 28, 2002, concerning his May, 2002 motorcycle accident. (Rec. 67). Plaintiff stated that he was unconscious for a short period of time after the accident, and that since the accident he has had pain in his toes, thigh, shoulders, and back. Plaintiff also stated that although he sees Dr. Caster for his depression, he has "felt the best he has in three years until this current illness, but since the accident has been sleeping 16-18 hours a day." (Rec. 67). Dr. Derickson referred Plaintiff for an MRI, which was performed on July 2, 2002. (Rec. 68). The MRI noted a cyst "consistent with a benign sublenticular cyst, which is a normal variant." (Rec. 109). Dr. Derrickson explained to Plaintiff that the MRI showed no hemorrhage. (Rec. 68).

### III.    Analysis

#### A.    Standard of Review

A *de novo* standard of review applies in this case.[9]  "In conducting a *de novo* review, the district court's 'role is to determine whether the ERISA plan administrator made a correct decision based on the record before it at the time the decision was made,'"[10] without deference to that decision or any presumption of its correctness.[11] Thus, "the Court must take a fresh look at all the evidence and decide, based on the medical record, whether the preponderance of the evidence supports the determination that [the plan administrator] reached."[12]  Further, under the *de novo* standard, the court gives the policy language "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words."[13]  The court construes the policy "without deferring to either party's interpretation."[14]

---

[9]See Hall v. UNUM Life Ins. Co., 300 F.3d 1197, 1200-01 (10th Cir. 2002) (*de novo* standard applies where the plan does not expressly grant discretion to the plan administrator).

[10]Gilbertson v. AlliedSignal, Inc., 2006 WL 775171, *2 (10th Cir. March 28, 2006) (quoting Hammers v. Aetna Life Ins. Co., 962 F. Supp. 1402, 1406 (D. Kan. 1997)).

[11]Id.

[12]Smith v. Reliance Standard Life Ins. Co., 322 F. Supp. 2d 1168, 1176 (D. Colo. 2004).

[13]Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996), quoting Blair v. Metropolitan Life Ins. Co., 974 F.2d 1219, 1221 (10th Cir. 1992).

[14]Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989).

**B.    Burden of Proof**

Generally, the burden of proving a disability is on the employee.[15]  However, "[u]nder ERISA, an insurer bears the burden to prove facts supporting an exclusion of coverage" because "federal courts treat insurer claims of policy exclusions as affirmative defenses."[16]  Thus, in this case Defendant has the burden of proving by a preponderance of the evidence that the Plan's mental illness exclusion applies to Plaintiff.

**C.    Analysis of the Record Medical Evidence**

**1.    Issue at Hand**

Plaintiff is unquestionably disabled.  However, the issue the Court must resolve in this case is whether the preponderance of the record evidence indicates that a psychiatric condition such as a depressive disorder, anxiety disorder, mental illness, bipolar affective disorder, or psychotic disorder was "caus[ing]" or "contribut[ing] to" Plaintiff's disability as of October 18, 2000, the date that Plaintiff's LTD benefits were terminated.  (Rec. 18).

The LTD policy does not define "caused" or "contributed to."  Looking to the "common and ordinary meaning"[17] of the terms in the context present here,[18] the Court

---

[15]See Gallagher v. Reliance Std. Life Ins. Co., 305 F.3d 264, 270, 275 (4th Cir. 2002).

[16]Fought v. UNUM Life Ins. Co., 379 F.3d 997, 1007 (10th Cir. 2004).

[17]Chiles, 95 F.3d at 1511 (10th Cir. 1996), quoting Blair, 974 F.2d at 1221.

[18]See Pirkheim v. First Unum Life Ins., 229 F.3d 1008, 1010 (10th Cir. 2000) (construing plan terms in the context of the particular plan clause at issue).

determines that under the Plan language, if an employee suffers from an organic brain dysfunction as well as a non-organic psychiatric illness, the employee's non-organic psychiatric illness has not "contributed to" the employee's disability if the organic brain dysfunction would be independently disabling even without the presence of the psychiatric illness. To interpret the Plan otherwise would mean that an employee whose sole affliction is a disabling organic brain dysfunction would be entitled to lifetime LTD benefits, while an employee who suffers from a disabling organic brain dysfunction *plus* a non-organic psychiatric illness would be limited to only to 24 months of LTD benefits. The latter employee thus would be penalized for his or her additional condition. This is not a reasonable interpretation of the Plan language.[19]

### 2.    The Objective Medical Evidence

The objective medical testing performed on Plaintiff did not reveal any physical source of a brain dysfunction. Plaintiff's biochemical workup was normal. (Rec. 55). The results of Plaintiff's EEG's in 2000 and 2002 were normal. (Rec. 239, 117-118). Plaintiff's 1998 CT scan was "basically normal." (Rec. 350, 52). Plaintiff's 1998 MRI scan did show a cystic lesion in the right temporal region which Dr. Peters felt was "of concern given [Plaintiff's] history," (Rec. 241) but there is no further information discussing the likelihood that, or means by which, this lesion might have affected Plaintiff's brain function. Dr. Thompson's neurological evaluation found no "convincing evidence of true neurocognitive defects." (Rec. 357). While the record indicates that

---

[19]See e.g. Eastman v. The Prudential Ins. Co. of America, 2008 WL 250597 (D. Minn. Jan. 29, 2008) (employing similar analysis).

the lack of positive objective test results does not rule out the possibility of an organic brain dysfunction, abnormal results would have established or at least helped to establish such a dysfunction. The lack of any positive objective medical test results in this case weighs in Defendant's favor.[20]

### 3.  The Subjective Medical Evidence

Dr. Peters, the only neurologist to have offered an opinion concerning Plaintiff's condition, suspected that Plaintiff had an organic brain dysfunction in December 1999. At that time he stated that, based on Plaintiff's symptoms, he was "quite concerned that [Plaintiff] has complex partial seizures," and felt that the cystic lesion in Plaintiff's brain was "of concern." Nonetheless, he stated that he would "make a decision" after an EEG was performed. Dr. Peters later stated that any abnormalities on the EEG "would be quite important." Defendant argues that because the two EEG's came back normal, Dr. Peters' ultimate conclusion that Plaintiff suffers from a brain injury should be discounted. However, Dr. Peters made clear that "it is not demanded that a diagnosis of seizure disorder be documented by an electroencephalogram but it is a helpful certifying finding." (Rec. 182). Thus, it appears that, according to Dr. Peters, a positive EEG would confirm an organic dysfunction but a negative EEG would not necessarily rule out an organic dysfunction. At the January 2003 appointment, Dr. Peters noted symptoms

---

[20]Although Defendant argues that the lack of objective medical evidence "alone was a reasonable basis for denying [Plaintiff's] claim," (Doc. No. 163 at 25), here the Court is not determining whether the administrator's decision was arbitrary and capricious or an abuse of discretion, as was the case in the opinions Defendant cites in support. See e.g. Atkins v. SBC Communications, Inc., 2006 WL 2821370 (10th Cir. Oct. 4, 2006); Parkman v. Prudential Ins. Co., 439 F.3d 767 (8th Cir. 2006); Ruiz v. Continental Cas. Co., 400 F.3d 986 (7th Cir. 2005). Rather, the Court is performing a *de novo* review.

such as anxiety, limited hand tremors, poor judgment, inattentiveness, and mild disturbances in memory and learning.  Dr. Peters also noted that Plaintiff recently had had "three episodes of unusual inappropriate behavior for which he has no remembrance . . . ."  (Rec. 215).  Based on these symptoms Dr. Peters reached the unequivocal conclusion that "organic factors are present here and are, themselves disabling."  (Rec. 215).  The Court gives significant weight to the opinion of treating neurologist Dr. Peters.

Dr. Caster initially diagnosed Plaintiff as having a purely psychological disorder with "no neuropsychological components at all."  (Rec. 137).  Then, in December 2002, Dr. Caster stated that "it has become increasingly clear" that Plaintiff has "cognitive dysfunction, difficulty with perceptual processing, memory function, headaches, mood discontrol, and at times coordination and disassociation, all of which are symptoms that are more suggestive of an organic basis then [sic] are symptoms of a classic or even atypical bipolar disorder or psychologically driven dysthymic disorder."  (Rec. 227).  Dr. Caster concluded that "[w]hile [Plaintiff] may well have had a coincidental mood disorder he however has a personality change secondary to general medical condition secondary to closed head injury."  (Rec. 227).  The following year, Dr. Caster stated that Plaintiff "suffers from a dual diagnosis":  bipolar disorder secondary to a closed head injury.  (Rec. 129).  While Dr. Caster did change his diagnosis, the Court does not find his ultimate opinion to be "speculative, tentative, and/or conclusory," as Defendant has argued;[21] rather, it was based on Plaintiff's specific listed symptoms and treatment

[21]LINA's Response Brief (Doc. No. 163) at 26.

history, as detailed in Dr. Caster's December 2002 letter to Dr. Dunham. Further, although Dr. Caster's change in opinion came after Plaintiff's May 2002 motorcycle accident, his December 2002 letter states that the symptoms on which his ultimate conclusion is based had been appearing "over the last four years of treatment." (Rec. 227). Dr. Caster did not explicitly state that the closed head injury would be disabling even absent Plaintiff's bipolar disorder. However, in stating that any personality or mood disorders are "secondary to closed head injury," (Rec. 227) his opinion supports the conclusion that an organic brain injury is the primary cause of Plaintiff's condition.

Like Dr. Caster, Dr. Maiman changed his diagnosis of Plaintiff's condition from a functional psychological disorder to an organic brain dysfunction in late 2002. Dr. Maiman based his final conclusion on the fact that Plaintiff's mental functioning was deteriorating despite years of treatment in which "different medications and modifications to the therapy were implemented." (Rec. 208). Like Dr. Caster, Dr. Maiman stated that Plaintiff's functional problems are "secondary to his organic problems." (Rec. 208). Dr. Maiman's opinion was not speculative or conclusory. Rather, Dr. Maiman based his opinion on the fact that Plaintiff's symptoms were getting worse, with intermitted periods of improvement, despite years of aggressive drug therapy.

In November 2002, Plaintiff reported to Dr. Dunham problems including mental status changes, mood swings that were not responding to anti-depressants, inability to concentrate, slowed speech, memory loss, and seizure-type activity. (Rec. 69, 235). Although Plaintiff reported these problems to Dr. Dunham in the context of expressing

concern about his disability coverage, Plaintiff had reported similar symptoms to Drs. Wilcox and Peters in 1998 and 1999 before his disability coverage issues had been raised.  Dr. Dunham agreed with Drs. Caster and Peters that Plaintiff's problems were organically based.

Even though Dr. Wilcox, a primary care physician, never opined that Plaintiff's problems had an organic source, he did report, as early as 1998, that Plaintiff's symptoms included memory loss, distance perception problems, loss of memory, and lack of response to medication, all of which, according to Dr. Caster, a psychiatrist, suggest an organic brain dysfunction.  Dr. Wilcox noted that Plaintiff was experiencing improvement in October 2000, but it is evident from other portions of the record that although Plaintiff did show intermittent improvement for periods of time, his condition was, overall, deteriorating.  (See Rec. 208, 226-27).

In 1998 Dr. Gamblin diagnosed Plaintiff as suffering from Major Depression, recurrent.  However, Dr. Gamblin did not expressly consider the possibility that an organic cause also could be contributing to Plaintiff's condition.  While Dr. Gamblin noted that Plaintiff was able to perform certain cognitive functions (such as proverb interpretation, word finding, and counting), he also stated that Plaintiff reported suffering from difficulty concentrating, memory loss, headaches, loss of ability to write coherent reports at work, and deterioration in handwriting.  Although Dr. Gamblin's report provides support for Defendant's position in this case, it does not clearly distinguish between organic and functional symptoms as do the records of Drs. Peters and Caster.

Finally, the most notable aspect of Dr. Derickson's records from June 2002 is their statement that Plaintiff reported that he has "felt the best he has in three years until this current illness, but since the [2002 motorcycle] accident has been sleeping 16-18 hours a day."  (Rec. 67).  However, Dr. Maiman noted six months later that while there had been "areas of progress" in Plaintiff's condition, "the overall picture was not improving, rather it was deteriorating . . . ."  (Rec. 208).  Again, the records in this case reflect that while Plaintiff did have intermittent periods of improvement, he was experiencing a general decline in functioning over time.

The Court does not find, as Defendant's briefing seems to imply, that Drs. Peters, Caster, and Maiman were persuaded by Plaintiff to issue diagnoses of organic brain dysfunction in contravention of their true professional opinions.  The records of these doctors contain well-supported, thorough, professionally appropriate judgments reached after repeated examinations and years of treatment.  Further, the mere fact that Drs. Caster and Maiman changed their diagnoses in 2002 does not establish that their ultimate opinions are not credible.  Each wrote detailed, substantial explanations for their changed diagnoses, which were based on Plaintiff's persistent, specific symptoms combined with his lack of response to years of aggressive anti-depressant drug therapy. Although there is subjective medical evidence on both sides in this case, the weight of that evidence supports the conclusion that Plaintiff's condition had a primarily organic cause as of October 18, 2000.

### 4.      Preponderance of the Medical Evidence

As discussed above, the objective medical evidence in this case supports Defendant, while the subjective medical evidence supports Plaintiff.  Ultimately, however, the Court is persuaded by the well-supported opinions of Dr. Peters, the only neurologist who offered an opinion in this case, and Drs. Caster and Maiman, Plaintiff's psychiatrist and psychologist.  Each of these doctors believed that a diagnosis of organic brain dysfunction was not dependent upon positive objective test results.  The Court has been given no cause to doubt the experience, expertise, and integrity of these doctors.  Certainly, positive objective test results would have made Plaintiff's condition easier to diagnose.  However, based on the documents in the record, the absence of positive objective test results is not dispositive.  The Court finds and determines that the preponderance of the evidence establishes that an organic brain dysfunction "caused" or "contributed to" Plaintiff's disability as of October 18, 2000.  Thus, the LTD mental illness limitation does not apply to Plaintiff.[22]

Accordingly, it is

ORDERED that LINA's Motion For Judgment On the Administrative Record (Doc. No. 14) is denied.  It is

FURTHER ORDERED that the parties shall pay their own costs and attorney's fees.  It is

---

[22]While the Court may award attorney's fees under certain circumstances in an ERISA case pursuant to 29 U.S.C. § 1132(g), see Graham v. Hartford Life and Accident Ins. Co., 501 F.3d 1153, 1162 (10th Cir.2007), neither party has requested or discussed attorney's fees in the post-appeal briefing, and attorney's fees thus are not awarded herein.

FURTHER ORDERED that the parties shall submit a joint proposed Final

Judgment on or before March 30, 2009.

DATED at Denver, Colorado, this 20th day of March, 2009.

BY THE COURT:

_____
ZITA L. WEINSHIENK, Senior Judge
United States District Court